IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| OHIO BALLROOM PRODUCTION, LLC, 842 CEDAR WAY YOUNGSTOWN, OH 44512 <br><br> and <br><br> TALIAT AND MARINA TARSINOV 842 CEDAR WAY YOUNGSTOWN, OH 44512 <br><br>　　　　　Plaintiffs, <br><br>　v. <br><br> KYRYLO MYSHAKOV 266 POTTERS CIRCLE GIRARD, OH 44420 <br><br> and <br><br> DTS DANCE, LLC c/o PURE BALLROOM DANCE STUDIO 8236 EAST MARKET STREET WARREN, OH 44484 <br><br>　　　　　Defendants. | CASE NO. _____ <br><br> JUDGE _____ <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |

Plaintiff Ohio Ballroom Production, LLC ("Ohio Ballroom") and Taliat and Marina Tarsinov (sometimes "Plaintiffs") for their complaint against Kyrylo Myshakov and DTS Dance, LLC and DTS Dance LLC ("DTS") (sometimes collectively "Defendants"), state and allege the following:

1

## INTRODUCTION

This case involves the world of ballroom dancing and in particular Fred Astaire Dance Studios of Ohio . While there are several commercial entities involved, the facts center on three individuals: Kyrylo Myshakov, a former sub-franchisee of Plaintiff Ohio Ballroom and Marina and Taliat Tarsinov, the two members of Ohio Ballroom. What began as a typical franchise business dispute between these parties has degenerated into a state of affairs so ugly as to include, among other things: (1) Myshakov physically assaulting a female franchisee of Ohio Ballroom by punching her twice in the face, his intention being to intimidate her to sever her relationship with Ohio Ballroom and (2) loudly and publicly accusing Taliat of a number of ugly Russian character traits which translate roughly into "pedophile," "predator," "sexual deviant," "faggot" and "scum of the earth". Even more outrageous is the fact that they were made in a crowded ballroom in front of a large number of people, including some of the most prominent ballroom dancers in the United States, all of whom are fluent in Russian. These indignities were intended to destroy the reputation of the Tarsinovs and the business of Ohio Ballroom.

While the many overlapping facts make a precise timeline difficult to draw, it is the assault and the disgraceful accusations that lie at the heart of this lawsuit and have left Plaintiffs with no alternative but to seek this court's relief. Myshakov's propensity for unhinged and violent behavior pose a clear and present danger to Plaintiffs' physical safety and business interests.

## THE PARTIES

1) Plaintiff Ohio Ballroom is an Ohio limited liability company with its principal place of business at 842 Cedar Way, Youngstown, OH 44512. It operates as the Ohio sub-franchisor for FADS USA, Inc. As such, Ohio Ballroom owns the sole rights to sub-franchise Fred Astaire Dance Studios in the State of Ohio.

2) Plaintiffs Taliat and Marina Tarsinov are husband and wife and sole members of

Ohio Ballroom. They are residents of the State of New York. Marina and Taliat are both members of the International Dance Board of Fred Astaire Dance Studios USA, Inc., as well as world class coaches and judges at the most prestigious ballroom championships and festivals around the world.

3) Defendant Kyrylo Myshakov is an individual and resident of the State of Ohio. Upon information and belief, Myshakov is not a citizen of the United States. Rather, he is a citizen of the Ukraine and is in the United States on a temporary working visa that expired in 2022. His present immigration status is unknown.

4) Defendant DTS is an Ohio limited liability company with its principal place of business in Warren, Ohio. Myshakov is, on information, the managing member of DTS.

5) Non-party FADS, USA, Inc. ("FADS") franchises Fred Astaire Dance Studios ("FADS") throughout the world and has done so for 75 years. As an important part of its product and branding strategy, FADS has developed and made significant investments in the distinctive appearance and operations of FADS which includes, among other things, identifying the FADS by means of proprietary trademarks, service marks, trade names, logos, photographs, images and other indicia of origin including the service mark "Fred Astaire Franchise Dance Studios™" (the "FADS Marks"). Moreover, FADS has created a unique way of teaching, taking students from first step to an advance performance by using a distinctive and proprietary system that includes many different dance levels. In fact, the original curriculum was created by Fred Astaire himself.

**JURISDICTION AND VENUE**

6) This Court has jurisdiction pursuant to 28 U.S.C., Section 1331 as certain of Ohio Ballroom's claims arise in part under the Lanham Act, 15 U.S.C. Section 1051 *et seq.*

7) Personal jurisdiction and venue are proper as all facts and circumstances arise in Mahoning County, Ohio. Moreover, the Sub-Franchise Agreement which is the impetus for this

lawsuit provides that any legal action initiated by Ohio Ballroom is to be brought in the United States District Court nearest to the principal place of business of Ohio Ballroom.

## FACTS

### History of the Relationship

8) On November 14, 2015, Ohio Ballroom entered into a Sub-Franchise Agreement (the "Agreement") with Travis Pownell, Dustin Jones and Sheri Forrester, (the "Original Franchisees") to operate a Fred Astaire Dance Studio in Warren, Ohio. The Agreement is not attached to the Complaint as it is over 100 pages and defendants already possess the Agreement and its content is not believed to be in dispute. However, should the Court or the defendants desire a copy, it will be produced. The Original Franchisees hired Myshakov as a dance instructor after he was fired from a Fred Astaire Dance Studio in Durham, North Carolina.

9) On or around January 20, 2018, the Original Franchisees sold and assigned their interests to Myshakov and DTS.

10) As will be seen, Myshakov was far from a model franchisee and he breached many provisions of the Franchise Agreement.

11) However, these breaches pale in comparison to his later actions which became increasingly unhinged and ultimately violent.

### Myshakov's Bizarre and Senseless Behavior First Manifests Itself

12) The original location of Myshakov's studio was a leased premises at 4365 Youngstown Road SE, Warren, OH ("Youngstown Road"). Like all other franchises, Youngstown Road displayed a large outdoor sign designating it as a "Fred Astaire Dance Studio" and carrying the distinctive Fred Astaire logo.

13) In or around August, 2019, Myshakov moved the studio to a new leased space at

Howland Plaza, 8236 East Market Street, Warren, Ohio 44484 ("Howland Plaza").

14) A critical provision of the Agreement was that any studio lease was to be solely between the sub-franchisee and the landlord. As such, Ohio Ballroom was not a party to either lease, Myshakov being solely liable on both the Youngstown Road and Howland Plaza locations.

15) After the move, Myshakov did not bother to take down the Fred Astaire Dance Studio sign on Youngstown Road. As a result, there were two Fred Astaire Dance Studio signs within the same general area. This was not only a breach of the Franchise Agreement, it soon devolved into a dispute about whose responsibility it was to remove the Fred Astaire Dance Studio sign from Youngstown Road. Under the Franchise Agreement the responsibility clearly lay with franchisee as part of a required "de-identification" process, and Marina so informed Myshakov of this.

16) Myshakov, however, took the position that it was not his responsibility to remove the sign from Youngstown Road but rather that of Ohio Ballroom. Even more bizarre, he began to complain incessantly to Marina that the presence of the signs at both Youngstown Road and Howland Plaza were a cause of confusion to the public as to the correct location of the studio, a state of affairs that Myshakov alleged was costing him "tens of thousands of dollars" in lost business. This sum , like all Myshakov's alleged monetary damages, proved to be delusional as Myshakov possessed no evidence to support it.

17) Marina investigated the situation in order to find out why Myshakov would have difficulty removing the sign himself. She later learned the reason: Myshakov still owed the Youngstown Road landlord $700 because he failed to leave the space in "broom clean" condition and as a result, the landlord refused to allow Myshakov access to the building.

18) Myshakov continued to complain incessantly to Marina and demand that either

5

Ohio Ballroom or the landlord remove the Youngstown Road sign even though he was contractually bound to do so. And even then, $700 was not a great deal of money to pay to remediate something Myshakov alleged was costing him "tens of thousands of dollars" in lost business.

19) Myshakov then began to threaten Ohio Ballroom with legal action if the Youngstown Road sign were not removed. When asked the basis of any lawsuit, Myshakov claimed a lawyer told him that it had to do with some type of "fraud and intellectual property violations" that he claimed were worth "millions of dollars." Despite repeated requests to provide support for this outrageous sum of money he refused to do so.

20) Myshakov's incessant complaining and absurd legal threats, especially over such a relatively modest amount of money, were becoming untenable. Seeing no alternative, Marina, as a goodwill gesture and to resolve this petty dilemma, volunteered to have Ohio Ballroom to pay the $700 Myshakov owed to the Youngstown Road landlord and an additional $724 for contractors to take the signage down.

21) Because of Myshakov's repeated threats to sue Ohio Ballroom for some unspecified legal violations, Marina sought Myshakov's consent to remove the sign and pay for it herself. Astonishingly, he refused. He told Marina that giving consent to Ohio Ballroom would jeopardize his mysterious legal claims against Ohio Ballroom, the Youngstown Road landlord and other unknown parties which he refused to make known. He maintained that any such lawsuit was worth "millions of dollars."

22) Marina and Ohio Ballroom were in a no-win situation: either do nothing and get sued or do something and get sued. Given this absurd and petty dilemma, she decided that the sanest course of action was to pay the landlord the $700 owed by Myshakov to settle the debt and

6

an additional $724 to hire a contractor to remove it.

23) Myshakov's refusal to pay the $1,424 himself and further refusal to give consent to allow Ohio Ballroom to voluntarily pay a bill as he was contractually bound to do, while at the same time complaining that the presence of the Youngstown Road sign was costing him tens of thousands of dollars in lost business, only presaged the calamities that were to follow.

### Ohio Ballroom Terminates the Sub-Franchise Agreement

24) The Agreement contained a termination date of September 2020. It also contained a five-year extension agreement, subject of course to negotiation and the consent of both parties. For approximately six months prior to the termination date, a potential extension was discussed. Myshakov went back and forth and signed a new franchise agreement, only to back out one week later.

25) Most of these negotiations took place before Marina was able to fully comprehend Myshakov's irrational, contentious and contrarian behavior. Although there was some hope of remediating the relationship, certain facts came to light which made an extension impossible. Myshakov began to refuse to honor his obligations as a sub-franchisee. He failed to observe the hours of operation required by the Agreement. And even during operating hours he was often absent without explanation.

26) The Sub-franchise Agreement further required that the sub-franchisee enter his students into a required number of Fred Astaire Dance Studio ballroom competitions because these were critical to the success of the individual studio as well as the Fred Astaire brand throughout the country. He refused. In addition, he was a temperamental instructor with a hair-trigger temper who would cancel scheduled lessons without reason and repeatedly threatened to abruptly close the studio and leave the country. Finally, Ohio Ballroom began to hear allegations of abusive

behavior on the part of Myshakov.

27) Ohio Ballroom had little choice but to terminate the relationship. Following the termination, Myshakov continued to flaunt the Agreement, now failing to observe his post-termination responsibilities. He ignored the non-competition provisions of the Agreement and solicited students to a new enterprise he was forming.

### The Lawyers Get Involved and a Resolution Comes Close

28) When Myshakov proved impossible to deal with, Ohio Ballroom retained the undersigned, its longtime counsel. I contacted Myshakov, first advising him to retain his own counsel. He chose not to do so and a series of correspondence and phone calls ensued. Throughout, I advised Myshakov to retain counsel and when communications became frustrating to the point of exhaustion, I beseeched Myshakov to do so.

29) Finally, Myshakov retained the services of Thomas Carey, a Warren, Ohio, practitioner. Mr. Carey proved to be a highly competent lawyer and a straight shooter. Plaintiffs hoped that Mr. Carey could contain Myshakov and talk some sense into him so that this matter could be finally brought to an end. As will be seen, Mr. Carey was able to do so but only for a time.

### Myshakov Physically Assaults A New Sub-Franchisee, Punching Her Twice In the Face

30) Following termination of the Myshakov Agreement, Ohio Ballroom entered into a new sub-franchise agreement covering Myshakov's previous territory with Leesha Thompson, one of Myshakov's former instructors. Leesha leased a new space at 2023 Elm Street, NE, Warren, OH 44483 to operate the new Fred Astaire Dance Studio.

31) On the evening of January 3, 2022, Myshakov appeared at Leesha's studio, which was not yet open for business. All doors to the studio were locked. Myshakov, under cover of

8

darkness, knocked on the door. Leesha opened it a crack to see who was knocking.

32) Myshakov suddenly burst in and punched Leesha twice in the face. He then fled the scene. Leesha was terrified and immediately called the police. She described the assault, told the police that she did not know what prompted the attack but said that Myshakov appeared highly intoxicated.

33) Leesha pressed charges against Myshakov but the dispute was settled civilly when Myshakov paid Leesha $5,000.

34) Despite the settlement and Myshakov's increasingly crazed behavior, Leesha and other parties affiliated with Ohio Ballroom began to fear for their personal safety.

## Myshakov Continues to Violate the Agreement

35) As stated earlier, the Agreement contained several post-termination covenants. Among them was a covenant not to compete which included a non-poaching provision prohibiting Myshakov from recruiting Ohio Ballroom students to any new enterprise.

36) Upon information and belief, Myshakov at that time was teaching former Fred Astaire Dance Studio clients at different locations before moving back to the Howland Plaza location, covered the windows and continued to teach in violation of the Franchise Agreement post-termination provisions.

37) Furthermore, Myshakov continued his contrarian behavior when he refused for many months to remove the Fred Astaire Dance Studio logo on Howland Plaza, yet another breach of the Franchise Agreement.

## The Escrow Dispute and Myshakov Fires His Lawyer

38) During this time, Ohio Ballroom sought to rid itself of Myshakov without success. A central dispute concerned certain escrow payments that were to be returned to Myshakov. By

FTC order, which is part of the Franchise Agreement, each Fred Astaire Dance Studio was required to maintain funds in an escrow account in order to satisfy client refund requests and other unfunded liabilities. According to all agreements between the studio and the student, whenever a studio closes clients have the right to request refunds for untaught lessons and undelivered services within one year. In this event, those requests must be sent to Ohio Ballroom as area sub-franchisor because Ohio Ballroom is a co-signer on each studio escrow account. Ohio Ballroom would then process refunds or transfer lessons to another studio within one year

39) In the case of Myshakov's studio there were a number of refund and transfer requests that were satisfied fully by Ohio Ballroom. Ohio Ballroom's supporting documentation was provided to Myshakov.

40) The one-year period ended in June of 2022 and Ohio Ballroom counsel made contact with Myshakov's counsel in order to finalize the escrow account and bring the entire matter to a close. Ohio Ballroom, on advice of counsel, took the position that the escrow funds would not be returned unless and until Myshakov gave Ohio Ballroom a complete written release of all claims that Myshakov threatened to have, as well as his promise to refrain from all contact with Ohio Ballroom or its franchisees.

41) Myshakov's counsel understood the wisdom of this position and readily agreed.

42) Negotiations towards an agreement moved smoothly and a resolution was within reach, even getting to a final draft agreed upon by both counsels. However, Myshakov abruptly fired Mr. Carey and negotiations broke off. Upon information and belief, Myshakov never retained other counsel even though he was once again advised by the undersigned to do so. Unfortunately, at that point, the situation deteriorated even further, especially so given the recent assault of Ohio Ballroom's franchisee.

**The Breaking Point: The Very Public Verbal Assault**

43) On the week of November 14, 2022, the largest and most prestigious ballroom dance competition in the United States, the Ohio Star Ball, was held in Columbus, Ohio. This competition was attended by thousands of students, instructors, and judges. The importance of these competitions in the ballroom dance world cannot be overstated. This and similar competitions are held all over the country and are critical to the success of individual and franchised studios, including Ohio Ballroom.

44) Taliat Tarsinov, Marina's husband and the other member of Ohio Ballroom, is a well-known and highly respected member of the international ballroom dance community. He has been invited to judge dance competitions of the highest level not just in the United States, but all over the world. Like other distinguished experts of dance, Taliat was chosen to judge the Ohio Star Ball in Columbus.

45) After the competition on Saturday, November 19, Taliat was speaking with a group of his longtime students and recognized champions, one couple silver medalists of the USA National championships and another couple recognized as Rising Stars in USA National champions. Seemingly out of nowhere, Myshakov abruptly approached the group and began to unleash a string of filthy insults towards Taliat. These humiliating indignities, spoken in Russian, roughly translate into degrading terms such as "pedophile," "predator," "sexual deviant," "faggot" and "scum of the earth." These loud and disgusting taunts could be heard over much of the ballroom area, which contained hundreds of people.

46) Many ballroom dance students are minors. Consequently, slurs such as pedophilia and sexual deviancy are poisonous. Furthermore, given Taliat's reputation in the world of ballroom dance, and the reputation of Ohio Ballroom and the Fred Astaire Dance Studio National Brand,

11

these types of sordid allegations can cause untold harm to the reputation and business interests of the Tarsinovs.

47) Unless Myshakov's unrestrained and dangerous behavior is enjoined, it will almost certainly continue to worsen and all parties connected to Ohio Ballroom, especially the Tarsinovs, will remain in fear of their personal safety and professional viability.

## CAUSES OF ACTION

### COUNT ONE

### BREACH OF CONTRACT

48) Ohio Ballroom realleges and incorporates paragraphs 1 through 47 of this Complaint as if fully set forth.

49) Defendants' actions as described herein have breached and continue to breach the Agreement.

### COUNT TWO

### FALSE REPRESENTATION OF AFFILIATION IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)

50) Ohio Ballroom realleges paragraphs 1 through 49 of this Complaint as if fully set forth.

51) The FADS Marks have been used continuously in connection with the operation of dance studios throughout the country for many years.

52) Defendants offered dance lessons, dance competitions and other dance-related activities unlawfully using the FADS Marks.

53) These activities are not approved by FADS and do not conform to FADS' brand standards.

54) Defendants' failure to meet FADS brand standards and specifications have resulted in the devaluation of the FADS Marks by tarnishing its image and undermining uniformity across the FADS brand.

55) Furthermore, Defendants' operation of its own dance studio in an unauthorized manner created confusion and left Ohio Ballroom powerless to control and manage the FADS Marks, its brand image and related goodwill.

56) Defendants' conduct described above, and their unauthorized use of the FADS Marks, constitute a false representation or affiliation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a)(1). Defendants' unauthorized use of the FADS Marks has caused confusion, mistake and/or deception in the marketplace as to both the quality and source of the dance activities and falsely suggested that the studio was sponsored or approved by FADS.

57) Defendants' infringement of the rights of Ohio Ballroom has been knowing, willful and in deliberate disregard of the rights of Ohio Ballroom. Ohio Ballroom is therefore entitled to enhanced damages and attorneys' fees under 15 U.S.C. Section 1117(a).

## COUNT THREE

## NON-COMPETE AGREEMENT

58) Ohio Ballroom realleges paragraphs 1 through 57 of this Complaint as if fully set forth.

59) Section 12.2 of the Agreement contains a non-compete provision which prohibited Myshakov and DTS from operating a dance studio within 25 miles of the Youngstown Road or within 5 miles of any company-owned FADS facility or any other FADS sub-franchise for a period of 18 months.

60) Defendants continued to operate an unidentified competing dance studio at the same Howland Plaza location.

## COUNT FOUR

## ATTORNEYS' FEES UNDER THE AGREEMENT

61) Ohio Ballroom realleges paragraphs 1 through 60 of this Complaint as if fully set forth.

62) Section 19.17 of the Agreement provides that in the event of breach or any violation, attorneys' fees, court costs and any other reasonable expenses shall be borne by the non-prevailing party.

## COUNT FIVE

## INTENTIONAL INTERFERENCE WITH CONTRACT

63) Ohio Ballroom realleges paragraphs 1 through 62 of this Complaint as if fully set forth.

64) Ohio Ballroom and Leesha Thompson entered an agreement under which Leesha would open a Fred Astaire Dance Studio in the Warren area, a fact of which Myshakov was fully aware.

65) Myshakov, under cover of night, forced his way into the studio and then assaulted Leesha in order to intimidate her into not opening the studio.

66) By so doing, Myshakov intentionally and tortiously interfered with the contract between Ohio Ballroom and Leesha Thompson.

## SLANDER AND SLANDER PER SE

67) Ohio Ballroom realleges paragraphs 1 through 66 of the Complaint as if fully set forth.

68) Myshakov's accusation that Taliat was a pedophile, made in front of at least four witnesses was intended to damage the reputations of Taliat and Marina Tarsinov as well as Ohio Ballroom.

## PUNITIVE DAMAGES

69) Ohio Ballroom realleges paragraphs 1 through 68 of this Complaint as if fully set forth.

70) Myshakov's outrageous actions in accusing Taliat Tarsinov of pedophilia rise to such a level as to warrant punishment.

## INJUNCTIVE RELIEF

71) Ohio Ballroom realleges paragraphs 1 through 70 of this Complaint as if fully set forth.

72) Given Myshakov's outrageous and violent behavior, he must be enjoined from doing further physical and commercial damages to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Ohio Ballroom requests:

a) A judgment that Defendants have violated Section 43(a)(1) of the Lanham Act;

b) Damages, including treble damages, pursuant to 15 U.S.C. Section 1117;

c) Ohio Ballroom attorneys' fees and costs per Section 19.17 of the Agreement;

d) Damages for Defendants' breaches of the Agreement;

e) Damages for Myshakov's intentional interference with contractual relations between Leesha Thompson and Ohio Ballroom;

f) Damages for Myshakov's slander and slander *per se* of Taliat Tarsinov, Marina Tarsinov and Ohio Ballroom;

g) Punitive damages sufficient to punish Myshakov for his outrageous actions;

h) An order enjoining Myshakov any further contact with Taliat and Marina Tarsinov, Ohio Ballroom, DTS students and any associates, and further enjoining him from any slanderous or libelous statements;

  i)  Prejudgment interest on any monetary award made part of the judgment against Defendants; and

  j)  Such other relief as the Court may deem just and proper.

            Respectfully submitted,

            /s/ Arthur M. Kaufman
            ARTHUR M. KAUFMAN
            ak@kdglegal.com
            Kaufman, Drozdowski & Grendell LLC
            29525 Chagrin Blvd., Suite 250
            Pepper Pike, OH 44122
            Phone: 216.346.8896

            ATTORNEY FOR PLAINTIFFS